[No. 21542.    Department One.    April 23, 1929.]

CARRIE F. STEVENS, *Appellant*, v. MAY DEPUE, *Respondent and Cross-Appellant*.[1]

¹Reported in 276 Pac. 882.

*Reynolds, Ballinger & Hutson,* for appellant.

*Carkeek, McDonald & Harris* and *Albert H. Solomon,* for respondent.

HOLCOMB, J.—This is an action in which appellant sued respondent for damages in the sum of fifty thousand dollars for alienating the affections of appellant's husband. Upon trial in the court below, the jury rendered a verdict in favor of appellant for one dollar. She appeals.

Appellant and Arthur D. Stevens were married in Binghamton, New York, on August 24, 1910, after an acquaintance of eight years. She was then employed and earning fifteen dollars per week, while her husband was earning a little less. After about a year, they removed to Detroit, Michigan, where both of them continued to work, she as a stenographer and he as a mechanic. They remained in Detroit until March, 1923, when, from the vicissitudes of fortune, Stevens lost his position and secured one with a company doing business at Portland, Oregon, as a traveling salesman, traveling out of Portland, through the western part of Washington. In September of that year, Stevens returned to Detroit and he and his wife almost immediately removed to Portland. There they remained until late in the fall of 1926, when, at the insistence of appellant, Stevens gave up a paying position and returned to Detroit, where they still live.

On the first trip to Portland in March, 1923, Stevens met respondent, who was then fifty-four years of age, a married woman and the mother of two sons, the oldest of whom at that time was about thirty-three years of age. About two years later, her husband

died. Stevens was then about forty-two years of age. His wife was about a year younger.

The allegations of the complaint of the appellant allege in substance:

(1) The marriage of appellant and Stevens on August 24, 1910; (2) prior to the wrongful acts of respondent, Stevens was an affectionate and loving husband to her and they lived happily from the time of their marriage until the interference of respondent; (3) that, on March 13, 1923, respondent met appellant's husband and thereafter, by a systematic course of courtship, consisting of displaying towards him evidence of warm affection, both by word and act, and of clandestine meetings and correspondence, alienated his affections from appellant; that by means of the wrongful acts of respondent, the affections of Stevens were alienated from appellant to her damage in the sum of fifty thousand dollars.

To this complaint, respondent filed a general denial.

After the rendition of the verdict of one dollar in favor of appellant, she moved for a new trial on the ground of misconduct of the jury and inadequacy of damages. Respondent moved for a judgment *n. o. v.* Both parties filed numerous affidavits to support and to controvert the claims of misconduct of the jury. The trial court apparently carefully considered all the affidavits and the record in the case, and on April 21, 1928, filed his memorandum decision, overruling both the motions of appellant and of the respondent. Respondent also appeals from the judgment against her, but in referring to the parties, plaintiff will be called appellant, and defendant, respondent.

While the errors claimed by appellant for reversal are most elaborately and insistently argued, they are not well separated in the briefs.

The first contention, rather vehemently argued

by appellant, is based upon misconduct of certain jurors, and it is insisted that the trial court erred in overruling her motion for a new trial upon that ground.

One of the jurors so assailed was a lady named Randolph. An affidavit was made to the effect that certain prejudicial statements were made to, or in the presence of, this juror by certain ladies, who were friends of respondent, in the ladies' rest room during a recess of the court, and that Mrs. Randolph was invited and accepted an invitation to dinner by some of the ladies there present.

All of the lady jurors filed counter-affidavits denying that any discussion of the case took place in their presence. The trial judge found that while there may have been statements made by friends of the respondent with reference to the merits of the case, they were not made in the presence or hearing of any juror and did not affect the verdict.

It appears to be uncontradicted that Mrs. Randolph was invited to stay down town for dinner and go to a political meeting after dinner with some ladies who, it appeared, were friends of respondent; but there is no evidence that they offered to pay for her dinner or did pay for it, or that she knew at the time that they were friends of respondent. There was no evidence, nor inference from the facts disclosed, that there was any misconduct on the part of Mrs. Randolph, or that she was in any way prejudiced against the case of appellant. She denied hearing any statement concerning the merits of the case in the ladies' rest room at the time mentioned. Therefore, the alleged misconduct on her part will not be considered as established. *State v. McChesney*, 114 Wash. 113, 194 Pac. 551. See, also, *Davidson v. Clow*, 149 Wash. 414, 271 Pac. 78.

■ The other juror assailed, one Slonaker, is supposed to have been insidiously influenced by a mysterious telephone conversation. This is shown by his own affidavit to the effect that, the day before the case was submitted to the jury, he received a telephone message from someone unknown to him who told him, in substance, that respondent was one of the wealthy women of the city; that affiant immediately said "wait a minute, the case is not settled"; and that before he could hang up the receiver, the person speaking said "there is money waiting for you if you decide for Mrs. Depue"; that affiant then hung up the receiver, which ended the conversation.

There is nothing in this showing that reflects in the slightest degree upon juror Slonaker. He exercised due care and caution in avoiding prejudicial contact. The fact that he was telephoned to, a thing over which he had no control, could not foresee, and which was not followed up, cannot be presumed to have influenced him in arriving at his verdict.

As the trial court justly said:

"If verdicts were set aside on such occurrences, no jury verdict would ever be secure. The use of the telephone by an opposing party or his friends would become an instrument for defeating justice. A new trial could be insured in any litigation by adopting the precaution of attempting to communicate with a juror. While it is the court's duty, if any proof of jury tampering comes to its attention, to promptly and quickly dispose of it, in this case there is no evidence upon which the court could act. We must assume the jury acted honestly until the contrary affirmatively appears. The proof in this case does not meet the requirements."

The trial judge said that the proof in this case did not meet the burden required that the juror had not acted honestly or that appellant had been in any way prejudiced.

While many cases and authorities are cited by both parties outside the decisions of this court, the question is determinable by our own decisions. *State v. McChesney; Davidson v. Clow, supra; Lehman v. Hoquiam,* 144 Wash. 181, 257 Pac. 388.

In the last cited case, there was a much stronger showing of misconduct, but it was held not to be such a showing, as would reverse the determination thereof by the trial judge, who was familiar with the atmosphere surrounding the trial and was qualified to see and construe the actions and conduct of the jurors and those having conversations with them outside of the court. We there reaffirmed a decision in *State v. Adamo,* 128 Wash. 419, 223 Pac. 9, to the effect that

"The granting of a new trial because of the alleged misconduct of jurors is in the discretion of the trial court and we will not interfere unless we are convinced that the discretion has been abused."

That is certainly true here. The trial court was better qualified to judge of the credibility and integrity of the jurors reflected upon in this case than are we, and after a careful deliberation, was satisfied there was no misconduct of the jurors to the prejudice of appellant. We are also so satisfied.

The next claims of error are argued together, and are to the effect that the court erred in overruling her motion for a new trial on the ground of inadequacy of damages, that the evidence was insufficient to justify the verdict and that it is against the law. Counsel for appellant argues the facts with great ability and energy. The difficulty is that most of the argument is for a jury. Were it not for the fact that the jury found for appellant in the sum of one dollar, thus holding respondent culpable in a certain degree, there would be nothing for us to decide.

We have examined the facts in this case with pains-

taking care, principally from the five-hundred-page statement of facts itself, reading all of the testimony of both parties and Stevens, from the original statement. We have also read and considered all of the exhibits chiefly consisting of letters intercepted by appellant, with shrewd artifice, in Portland and Detroit, from respondent to Stevens, at secret addresses, and some to a name assumed by Stevens.

While it is true, as counsel say, and it is admitted by respondent, that appellant is and always has been a good woman, fond of her husband, and that, up to about the time her husband left Detroit first to go to Portland, they had had very little difficulty in their marital relations, and generally speaking, he was a devoted husband, there is some evidence coming from appellant herself that she had discovered some evidence of philandering which she did not approve on the part of her husband with a woman in or near Detroit whose name need not be mentioned. This is shown by correspondence between appellant and her husband shortly after he came west. There is also evidence that, after her husband came west, he discovered that women found him attractive and he became, in his own eyes, something of a "gay Lothario," nor did he confine his attentions to any one woman. He brazenly boasted, in court, of affairs with several women.

Counsel themselves describe him as a "very poor stick"; declaring that he had become that sort of man who would receive favors from women and boast of them; would pay his own way from Detroit to attend the trial in this case in order to support the cause of his wife's adversary, and oppose the wife whom he claimed in his testimony to love. Counsel also put their own value upon him in saying:

"If he were put up at auction and sold for one dollar, the sale could not be set aside because of inadequacy of the consideration."

Counsel insist, however, that, because his wife loved him and he made her happy, it is not what Stevens is worth upon a fair appraisal that should govern the size of the verdict in this case, but the thing which appellant lost and for which the jury found she is entitled to recover.

It may be true, as appellant insists, that the value of her husband's affections was to her very great. Faithless and worthless as he is, his affections may be to her "more precious than rubies." But that does not justify a court and jury in attempting to equalize conditions by taking from his enticer, however rich, money to the value of the appraisal put on his affections by the injured wife.

The trouble is, there is no market value for affections; no fixed standard or rational basis by which they may be measured; nor can damages in this state be based upon punitive or exemplary considerations. *Phillips v. Thomas*, 70 Wash. 533, 127 Pac. 97, Ann. Cas. 1914B 800, 42 L. R. A. (N. S.) 582.

In the above case we alluded to facts similar to those in this case as of necessity, greatly mitigating damages. The alienated husband was nearly fifty years of age; his enticer, a woman fifty-six years old. There was evidence tending to show conduct on his part with other women during a period of three years before their divorce, indicating unfaithfulness. The parties had been practically separated in that case for about three years. There were other facts which the court thought indicated little affection for the wife. We set aside a verdict as rendered by a jury of thirty-five thousand dollars and reduced by the trial court to twenty-five thousand dollars, as grossly excessive,

ordered a new trial and strongly indicated that no verdict in excess of six thousand dollars could be sustained.

Here the husband was about forty-five years of age, his alleged alienator about fifty-nine years, and the injured wife forty-four years of age at the time of suit. The husband has indicated a disposition to be errant with others. His affections are worth but little. The jury evidently and sensibly concluded that there had been a trespass by respondent upon the rights of appellant as a wife, by the course of covert correspondence on the part of respondent progressing for a period of nearly four years, of slight damage. While the correspondence, as discovered, discloses no intimation of illicit relations between respondent and Stevens, there is a degree of familiarity in her endearing salutations and subscriptions improper on the part of a woman corresponding with a married man. There is no proof of any undue intimacy between respondent and Stevens directly, or to be inferred by the letters written by her to him. Therefore, while there was a legal invasion of the conjugal rights of appellant, there was, from all the evidence, little, if any actual, substantial damage done by respondent to appellant.

Appellant cites our decision in *Bingaman v. Seattle,* 139 Wash. 68, 245 Pac. 411, as sustaining her contention that, when a finding of liability has been made in her favor and only nominal damages allowed her, it is a perversion of justice and the verdict should not be allowed to stand.

The case cited is not apt. That was a case of legal and constitutional liability for damages. When the jury found the facts in favor of appellant, the fixing of damages was a matter of mathematical computation. One dollar was no damage and appellant in that case was entitled to substantial damages, capable of

definite proof, which we found were definitely proven and the verdict should have been for the amount proven.

As we have hereinbefore indicated, in this case there is no way of estimating with certainty what damages should be allowed to appellant.

In passing upon the motions for a new trial or for judgment *n. o. v.* by respondent, the trial judge referred to things we think very pertinent on this phase and said:

"At the time the plaintiff commenced her action she was living with her husband in Detroit, occupying the same house and receiving from him financial support. Under these circumstances the jury would have been warranted in deciding there was no monetary damage in that particular because of defendant's action. There remains the comfort and companionship. The comfort and companionship of the alienated husband seems of doubtful value. There was evidence which, if believed, would have warranted a good woman like the plaintiff in placing little or no value on Arthur Stevens' society and which may have convinced the jury that the plaintiff was not entitled to a substantial verdict because of the derelictions of a faithless husband."

There was substantial evidence before the court and jury in this case in support of the above statements. Again we agree with the trial judge that, in a case of this character, the court should not substitute its judgment for the verdict of the jury. We therefore conclude that the trial court did not err in denying appellant's motion and in refusing a new trial.

We come now to a consideration of the appeal by respondent. Her cross-appeal is based upon her claim of error that, since it appeared in this case that appellant and her husband were living together at the time the suit was instituted, appellant could not maintain an action without either joining her husband with

her or making him a defendant. This claim of error was presented at an early stage of the case and was preserved throughout.

The question is, Can a married woman under the laws of Washington, maintain an action for the alienation of the affections of her husband where she is living and cohabiting with him and brings the action without his consent or knowledge and does not make him either plaintiff or defendant?

This is a rather difficult question. Respondent concedes that the great weight of modern authority is generally to the effect that when the affections of a husband have been alienated by another, the wife has a right to her own action, as if a *feme sole,* for the damages to her. We have had a number of cases in this state where the wife has sued alone for damages for the alienation of a husband's affections, but in nearly every case there had been an actual separation from the husband and in some instances a divorce had been granted before suing.

In an early case, *Beach v. Brown,* 20 Wash. 266, 55 Pac. 46, 72 Am. St. 98, 43 L. R. A. 114, this court took a position against those courts which had held, in line with early common law decisions in England, that the wife had no property in the *consortium* of her husband, and that her position as a wife precluded her from bringing such action. We quoted approvingly from the leading case in this country, *Foot v. Card,* 58 Conn. 1, 18 Atl. 1027, which also rejected the old, barbarous common law doctrine. Other cases were also cited in consonance with that authority.

Our statutes respecting this proposition were the same then as now. As now codified, Rem. Comp. Stat., § 6900, reads:

"Every married person shall hereafter have the same right and liberty to acquire, hold, enjoy, and dis-

pose of every species of property, and to sue and be sued as if he or she were unmarried.''

Rem. Comp. Stat., § 6901, referred to in the foregoing opinion as Bal. Code, § 4503; Hill's Code, § 1409, is to the effect that:

"All laws which impose or recognize civil disabilities upon a wife, which are not imposed or recognized as existing as to the husband, are hereby abolished, and for any unjust usurpation of her natural or property rights she shall have the same right to appeal in her own individual name to the courts of law or equity for redress and protection that the husband has: . . .''

Judge Dunbar, writing the opinion in that case, said that, if the first section was not conclusive of the question, the second section made it absolutely so.

The question is complicated somewhat by our community property laws and the fact that, at the time the liability was incurred and the suit commenced, appellant and her husband had not been divorced, were not even separated, and the presumption might be that the recovery would become community property.

In the *Beach* case, *supra,* the action was brought after the wife had obtained a divorce, the community having been thereby destroyed, the court found it unnecessary to concern themselves over the proposition as to whom the damages, when secured, would belong.

Nor do we consider it necessary to determine in this case to whom the damages will belong when recovered. Even were they substantial in amount, we should not consider it material. It would be to prejudge the title to the property. It is enough to hold, as we do, according to the very great weight of authority, and under our statutes, that the wife has the right to sue for damages for unjust usurpation of her natural rights. Whether, when recovered, the damages will belong to her or the community is immaterial to

us. Since she has the right to sue for her damages alone, she has the concomitant sole right to satisfy and discharge any judgment in her favor.

*Humphrey v. Pope,* 122 Cal. 253, 54 Pac. 847, cited by respondent as in her favor, seems to us as supporting what we have said. In that case, the code of California specifically gave the right to a wife to sue in her own name just as the code of this state does. The supreme court held that she had a right to sue for damages for alienation of her husband's affections without joining the husband. In passing upon the question the court observed:

"Where the husband sues for the loss of his wife's affections, the fact that the damages might or might not be held to be community property would not affect his right of action, and we can see no reason why any different rule should apply where the wife brings the action. Conceding, but not deciding, that any damages the plaintiff may recover would be community property, we think the action properly brought in her name alone."

Another cited case by a California district court of appeal, seems to be opposed to the earlier supreme court decision, in holding that desertion of a wife by her husband was a prerequisite to an action by her for alienation. *Codoni v. Donati,* 6 Cal. App. 83, 91 Pac. 423. That case, however, was really decided upon the facts, that no alienation of her affections was shown, and the contrary appeared.

Our conclusion is that appellant had the right to sue alone for the damages claimed, regardless of whether such damages, when recovered, would become community or separate property.

Upon the whole case, after a careful consideration, the judgment is affirmed as to both appeals.

MITCHELL, C. J., TOLMAN, FULLERTON, and BEALS, JJ., concur.